JACOB AURACHER *et al.*, Appellants, v. J. F.
YERGER *et al.*

Religious Societies: Powers of Conference: DELEGATION OF.
Where a body, the supreme executive, legislative and judicial head of
a church, is authorized in conjunction with the bishops to fix the time
and place of its next meeting, and does, the bishops being present,
fix the time, action unanimously taken giving the bishops and others
power to select the place, will not be interfered with by the temporal
courts, in favor of subordinate conferences which seek to treat the
acts of a General conference so appointed as being void.

SAME. Under the rules of the church, the 'oldest annual conference ap-
points the time and place of the next General conference, if no action
is taken by the General conference. *Held,* that under the facts above
set out the said annual conference had no power to appoint.

*Appeal from Polk District Court.*—HON. W. F. CONRAD,
Judge.

FRIDAY, MAY 11, 1894.

THIS is a suit in equity, and it involves a church
controversy between two opposing parties, each claim-
ing to be the true adherents of the Evangelical Associa-
tion of North America. There was a decree dismissing
the plaintiff's petition, and they appeal.—*Affirmed.*

*Gatch, Connor & Weaver* for appellants.

*Ed. P. Smith, E. B. Esher,* and *Read & Read* for
appellees.

ROTHROCK, J.—The Evangelical Association of
North America is a voluntary unincorporated religious
denomination, which was organized in this country
about the beginning of this present century. Its doc-
trine, discipline, and church government are all very
much like that of the Methodist Episcopal Church. Its

ecclesiastical organization consists of the society or congregation divided into classes. Each congregation holds it quarterly conference, which is the local governing body of each charge, and it meets four times each year. The general association is divided into what are known as "Annual Conferences," of which there are twenty-five in number, each of which holds a session annually; and its membership consists of all fully ordained ministers who have been in the itinerancy. These annual conferences are under the control of what is known as the "General Conference," which meets once in four years. The annual conferences are subordinate to, and are established or abolished, reorganized, or their boundaries changed by the general conference. The annual conferences are presided over by a bishop, if one is present. In the absence of a bishop, the members of the conference are required to elect a president, and the president and the presiding elders of the conference assign the preachers to their respective charges. The general conference consists of one member for every fourteen or fraction of seven or more members of each annual conference, and they are elected by a majority vote of the members of the annual conference. The general conference elects the bishops for a term of four years. The law or constitution of the church is contained in a book called the "Discipline," in which the powers of the different official bodies of the church are prescribed. As pertaining to the powers and jurisdiction of the general conference, the Discipline provides as follows: "Section 72. At general conference a bishop shall preside; but, if there be no bishop present, then the president shall be elected in like manner as at the annual conferences. Two thirds of the aggregate number of delegates shall constitute a quorum. Section 73. The general conference shall have power to make rules and arrangements for our church, under the following restrictions: (1) The gen-

eral conference shall have no power to alter, to detract from, or to add to any of our articles of faith, except with regard to the governments of other nations. (2) It shall have no power to alter any rules or forms of our Church Discipline (the rules of our temporal economy being excepted) unless such alterations are previously recommended by two thirds of the members of all the annual conferences, who may be present at the sessions of the same; whereupon the general conference shall have power, by a majority of three fourths of their votes, to alter any of our rules or forms, excepting the Articles of Faith. It shall also have power by three fourths of its votes to recommend to the annual conferences an alteration of any one of said rules or forms; and, after such alteration shall have been approved by two thirds of the members present at the sessions of all the annual conferences, it shall, by our bishops, be declared a law, and introduced as such into our Church Discipline. Section 74. The general conference is the supreme court of law in the church. It shall decide upon the legality of all acts of annual conferences, and upon all such cases as may arise between the annual conferences, and such as may arise between any incorporated society of the church and and its officers or any annual conference; and in its judicial capacity it shall decide, render verdict, and declare judgment only on such cases as are lawfully brought before it for adjudication."

A general conference of the association was held at Buffalo, in the state of New York, in the year 1887. There is no question made as to the legality of that conference, and, so far as appears, there were then no differences in the association at large. The proceedings of that conference, so far as the record before us shows, do not disclose that there were opposing factions in the church. There may have been dissatisfaction and objection to some of the officers of the confer-

ence, but it does not appear that there was any active disturbing element. The next general conference was required to be held in the year 1891. The Discipline provides that the time and place for the general conference shall be appointed as follows: "Section 71. The time and place of the general conference shall be appointed by the bishops, with the consent of the majority of the conference; and, if there be no bishop present, the general conference shall do it by a majority of votes, or the oldest annual conference, who then shall give the other annual conferences due notice of the time and place." The general conference at Buffalo in 1887 adopted the following resolutions: "Resolved, that the next session of the general conference shall begin on the first Thursday in October, 1891." "Resolved, that the matter of appointing the place of the next general conference be referred to the board of publication." These resolutions were unanimously adopted. No question was raised by any member of the conference as to the power of the bishops and the conference to refer the naming of the place of the next general conference to the board of publication.

It should be stated in this connection that it was the usual custom for different societies or charges to make known to the general conference a desire to have the next conference to meet with them. There was but one such invitation presented to the Buffalo conference, and before that order of business was reached in the deliberations of the conference the invitation was withdrawn, and it is apparent that no place could then be named without the risk of the meeting of the next conference at a place where the local society had made no offer to extend the hospitality usually accorded to general conferences of the association. The board of publication is composed of the bishops of the church and eight other persons, selected from eight districts, into which the general association is divided. We do not understand that any claim is made that the members of

this board were not capable of making a judicious and proper selection of the place for the next meeting of the conference. The contention of appellants is that the Buffalo conference had no lawful or constitutional power to refer the selection of the place to any committee or board, nor to any other agency. In October, 1890, the board of publication, in pursuance of the authority of the general conference, appointed the place for the next meeting of the general conference at Indianapolis, in the state of Indiana, and publication of the place selected was at once made in the newspapers and periodicals of the denomination. Bishops Bowman and Esher were present at this meeting of the board, and no question is made that the board was not lawfully convened. In the meantime serious controversy had arisen among some of the members of the association, which involved opposition to the bishops of the church, and a church court was convened, and all the bishops were deposed from office. If this church trial was legally convoked, and its proceedings valid, its judgment against the bishops suspended them from office until the next general conference. Bishop Dubs accepted the order of suspension, but Bishops Bowman and Esher claimed that the whole proceedings against them were absolutely void. Afterward and in February, 1891, the East Pennsylvania conference, claiming to be the oldest annual conference, held its annual session, and, assuming that the resolutions of the Buffalo general conference, authorizing the board of publication to name and appoint the place of meeting of the next general conference were void, named the city of Philadelphia as the place for that meeting. This conference refused to recognize Bishop Bowman, under the claim that he had been suspended from his office of bishop. This was the beginning of what afterward culminated in a division of the church into two contending parties. An alleged general conference was held at Philadelphia,

and another at Indianapolis, at the time appointed by the general conference at Buffalo, each claiming to be the lawful general conference. The Indianapolis conference reversed the proceedings of the church court which suspended the bishops, and held the judgment of suspension to be absolutely void, and reelected Bishops Bowman and Esher for the ensuing four years. The Philadelphia conference ratified the suspension, but reelected Bishop Dubs and two others to the office of bishop. Of the twenty-five annual conferences which were represented in the two claimed general conferences eighteen unanimously accredited their delegates to the Indianapolis conference, being of the opinion that the suspension of the bishops was wrongful and void, and that Indianapolis was lawfully selected as the place to hold the conference. In five of the remaining annual conferences Bishops Bowman or Esher appeared to preside over their deliberations, and were excluded, and the conferences divided, each claiming to be the lawful annual conference. Those belonging to what is commonly known as the "Bowman and Esher party" selected delegates to the Indianapolis conference, and the "Dubs party" selected and sent their delegates to the Philadelphia conference. There were but two of the annual conferences which adhered without division to what is known as the "Dubs Party." When the two general conferences convened, it was found that the total membership of the Indianapolis conference was one hundred and that of the Philadelphia conference forty-six.

The controversy involved in this action originated at the Des Moines annual conference, which was held in the city of Des Moines in the year 1890. The members of that conference were rightly convened. Bishop Bowman appeared, and proposed to preside at the conference. A large majority of the conference refused to recognize him as bishop, and he, with a minority of six,

withdrew, and organized and held a conference at another place. Each one of these claimed conferences held meetings in 1891, and each assumed to appoint preachers to the different churches or charges in the conference. The plaintiffs in the action are preachers representing the majority annual conference, and they belong to what is known as the "Dubs Party," and they demand that the defendants, who are preachers representing the Bowman and Esher annual conference, be restrained from attempting to occupy the pulpits of certain church buildings as ministers of the Evangelical Association, because the plaintiffs are invested with that right, being the regularly appointed preachers in charge.

We have given a sufficient statement of facts to disclose the questions involved in the controversy. If the Indianapolis general conference was according to the law and discipline of the denomination the regular general conference, and if its acts in declaring the suspension of Bishops Bowman and Esher absolutely void from the beginning were authorized and valid, we think the plaintiffs have no standing in a court of equity. It is apparent that there is but one regular Evangelical Association. No one claims that there are two such religious denominations. One party to the controversy in this suit must be held to represent the association, and when that question is determined it appears to us there is no other question which demands serious consideration. Either the Indianapolis conference or the Philadelphia conference was the legal and authoritative supreme head of the association. This is not a case of a separation or schism of a denomination involving differences of views as to religious doctrine or faith. In such cases it is everywhere held that the party adhering to the established faith and belief of the church is the lawful body, although it may be in the minority. The question as to the power of the bishops and a majority of the Buffalo conference to

select and appoint the place of the next meeting by referring the matter to a committee must be determined by the proper construction of section 71 of the Discipline, which is above set out. The question has been elaborately discussed by counsel, and many authorities have been cited in arguments in behalf of both parties. It is not our purpose to review the decisions of other courts. From the very nature of the section of the Discipline involved in the controversy, no case can be found which is in all particulars like this, with the exception of two cases hereinafter referred to. It appears to us that there are some questions presented in argument which are not necessary to be considered in determining the main question presented by the record. It is claimed that consideration should be given to the fact that the Des Moines annual conference, which convened in 1890, acted in good faith in refusing to recognize the right of Bishop Bowman to preside over that body; and it is further contended that the action of the Indianapolis conference in reviewing the suspension of the bishops was *ex post facto*, and in the nature of a bill of attainder, because, by the discipline of the church, the bishops were suspended, and not authorized to act in the interim between the judgment of suspension and the action of the general conference which declared the suspension void. It appears to us that all these questions, and others which are urged, are immaterial, because the plaintiffs in this case, who are preachers, are acting under alleged appointments to charges made since the general conferences were held in 1891; and, if the Indianapolis conference was the proper and rightful general conference, it was the duty of the plaintiffs to recognize its authority in all church affairs after that time.

This action was commenced in April, 1892, and the appointments of the plaintiffs to their present positions were made by what is known as the "Dubs Party"

in March, 1892, some six months after the the Indianapolis conference was held. There can, therefore, be no just claim that the action of the Indianapolis conference was after the fact, or *ex post facto*, so far as the rights of the plaintiffs are now involved. As we have stated, the Buffalo conference fixed the time for the meeting of the next general conference. Had it the power to authorize the board of publication to appoint the place of said meeting? Or, in other words, was the delegation of the authority to appoint the place such a manifest departure from the law of the church as found in section 71 of the Discipline as to be void? Counsel have elaborately discussed the question whether the exercise of the authority to appoint the place was an executive, legislative, or judicial act. We think it unnecessary to determine that question. It is to be remembered that the general conference is the supreme executive, legislative, and judicial head of the denomination. The oldest annual conference was not invested with any original authority to act in the premises. It could appoint the place only in case the bishops and a majority of the conference failed to act on that matter. But the conference did take action, and we think the reference of the place to the board of publication was not such a departure from the letter or spirit of the Discipline of the church as to authorize civil courts to declare the action of the conference void. It is not the province of temporal courts to assume ecclesiastical jurisdiction. The decisions of proper church tribunals must be accepted as conclusive, and are not subject to review. In 1 High on Injunction sections 310, 314, it is said: "The principle may now be regarded as too well established to admit of controversy that, in case of a religious congregation or ecclesiastical body, which is in itself but a subordinate member of some general church organization, having a supreme ecclesiastical judicatory over the entire membership of the organization, the

civil tribunals must accept the decisions of such judicatory as final and conclusive upon all questions of faith, discipline, and ecclesiastical rule." We regard the above as a clear statement of a rule which has long been established in the courts of this country, and we adopt it without a review of the numerous cases cited by counsel.

We might extend this opinion to a great length by considering the manner in which the general conference regarded this and other provisions of the law of the church. There is a history or line of precedent acts of former general conferences which strongly tend to show that by the general usages of the church a mere subordinate incidental provision like the one now in dispute was not regarded of such importance as to demand the strict and mandatory construction of the Discipline contended for by the appellants. If such mere matters of detail are required to be so magnified, if the next general conference should appoint the city or town where the succeeding conference should be held, and should fail to designate the particular church edifice by street and number, the claim might be preferred that no selection of a place was made, and the oldest annual conference, an inferior and subordinate judicatory, would again assume to overrule the supreme court of the association. The contention of the appellants is not that the Dubs party and the East Pennsylvania conference acted in ignorance of the fact that the board of publication had appointed the place for the conference. Every reader of the church periodicals knew that the conference was to be held at Indianapolis, and the action of the East Pennsylvania conference was had for the very purpose of overruling and disregarding the action of the Buffalo conference. But we do not think further elaboration is necessary. In our opinion, the appointing of a place for the meeting of the next conference was merely an ecclesiastical matter, which

involves no property or civil rights, and over which the highest judicatory of the church has supreme control; and that the plaintiffs in this case can not be allowed to question the correctness of the action of the Buffalo conference. The Indianapolis conference was the lawful high church court of the association, and was authorized by the constitution of the church to review and declare void the proceedings which resulted in the alleged suspension of the bishops, and to elect others for the constitutional period, and that the annual conferences over which they presided are the lawful conferences of the association.

The precise questions involved in this case were determined by the supreme court of Illinois more than one year since in an elaborate and well considered opinion (*Schweiker v. Husser*, 34 N. E. Rep. 1022); and practically the same questions were determined by the supreme court of Ohio, March 20, 1894, in which no opinion was filed. The decisions in those cases appear to us to correctly determine the issues between these parties to this unfortunate controversy. The decisions in the cited cases are in line with the views we have herein expressed, and it appears to us to be highly important that there should be a consensus of judicial authority on the question, for the reason that conflicting decisions will tend to continue unnecessary strife and contention, which should forever cease. The decision in the case in the Ohio courts was pleaded in this case as an adjudication. We have not thought it important to determine that question, because we are well satisfied to dispose of the case upon its merits. The decree of the district court is AFFIRMED.